Welcome. Just to remind everybody before you start, 20 minutes aside, the appellant will have an additional 5 minutes. You don't need to reserve it for rebuttal. Please keep your voices up. We've got a full courtroom and this microphone does not amplify, it only records. So please keep your voices up. Whenever the appellant is ready to begin, you may begin. Good morning, your honors, counsel, may it please the court. Terrence Temple was convicted of a felony simply for possessing a gun in a park. This is conduct that falls under the 2nd Amendment's protections of the right to bear arms in public for self-defense. And the state has failed to show a historical tradition of categorical bans on gun possession in public parks or places that would authorize felony penalties. So it's the state's burden to make that show? Yes, because... How do you make the show? Bruin sets out that if the plaintext cover, if the individual's conduct is covered by the plaintext of the 2nd Amendment, then the burden shifts to the state. And so in order to meet that burden, the state has to offer historical analogs that are similar in some way. Your honors, the lawyers aren't trained as historians, are they? I would agree. So do you put on expert, or do you point to learned treatises, or do we just take the history of the world according to the 9th Circuit? I think certainly in Wolford and Antonio, the state actually offered specific statutes. I think that is one way that courts have allowed the state to meet its burden. I don't think the Supreme Court has articulated a specific means for the state to meet its burden in these tests, but certainly in some of the cases that have in the 9th Circuit, 2nd Circuit, in those cases, the state actually put on statutes that were, I would argue, not in the relevant time periods, or not addressing the same subject matter as this. Right. Your view is they're too new, they're only 150 years old. Well, yes, but they are after the periods that Bruin sets out as being relevant for the history that they're considering. And in part because there were parks at the founding. There were public parks that existed, and since the state is not putting on regulations that prohibited gun possession in those parks. So that's part of the historical analysis that we need testimony on, about what was a park in Boston in the 1700s? I think that I've raised that there were parks that were used for the same purposes we use parks today, and because those existed at the time of the founding without bans on gun possession, then that's strong evidence that the founders wanted to permit gun possession in those spaces. And again, the UUW imposes... Did you actually put on evidence that there were parks at the time of the founding, and what was the nature of that evidence that you put on? The reply, I mean what I raised in the reply brief. Okay, so that's not evidence that's raised on appeal by citation to certain historical documents?  Okay, so no finding of fact has been made on what I think is disputed as to whether or not there were parks as we understand them at the time of the founding. Because the state's position, I think, is that there weren't. And again, the Bruin test says it's the state's burden to prove, and if the state hasn't provided a historical... If there were no parks at the time of the founding, they have to prove that as an evidentiary matter? Because that's not citing a statute. We're citing 1800 statutes, but of course we have to prove the fact that there's no parks? Well, I... No one cares about history at the time of the founding. I really can't say. I don't think the Supreme Court has laid out what exactly, by what means, or at what stage. And so... Well, generally speaking, when you have to prove a fact that isn't within common knowledge, and it's not something a court can take judicial notice of, you have to put on an X-score. That's generally how it's done, I think. And it's the state's burden to do that. And wherever this is, again, it's the state's burden. Since this conduct is gun possession in a public park, the state has to prove a historical tradition. Here, they have not put forth... They haven't even identified the statutes they would suggest. Has there ever been a time in the city of Chicago when it has been legal, when there's been a... When it hasn't been proven. May I ask that? Sir. I believe that the statute that Wilford references is from 1872. So prior to 1872, I don't know of any regulation that would have prohibited that. Would have prohibited gun possession in public parks. And it's your view that that, over 100 years since 1872 plus, that is not relevant. Because Bruin identifies the relevant historical periods for establishing a tradition and puts a premium on the founding, possibly the ratification of the 14th Amendment. I also want to point out that the 1872 prohibition only authorizes fines. And many of the other statutes mentioned in Wilford reference, those only authorize fines. Which is... The penalties of the UUW statute that authorizes Class III felony convictions is much more severe. And both Bruin and Rahimi talk about how... When what is authorized by a current regulation is much harsher than what is authorized by whatever historical analogs are being presented, that that is evidence of unconstitutionality. And so Wilford does discuss how, and maybe Antonia as well talks about how there weren't challenges to the unconstitutionality of these parks regulations where a prohibition of firearm is a part of those. And I don't think that's a surprise given that only fines are the authorized penalty. And I think that in that park regulation for Chicago, some of the other things that are prohibited in parks are walking on grass, not marked common, defacing trees. And I think that if these are the statutes that establish a historical tradition, then the penalties we impose for gun possession in a park should be comparable to what's imposed for climbing fences or defacing trees. The historical tradition that, if there is one, if that is long enough ago to establish a historical tradition, then it's simply not authorizing the penalties that the UUW statute imposes. So is there a case that, because you didn't, I don't think say one, in which any court has found that banning guns in public parks does violate the Second Amendment? I don't have one, but this court has addressed in People vs. Bell, this court did address whether the state had shown a historical tradition that parks were sensitive places and found that the state had not presented a conclusive tradition there. Now that case was decided under means and scrutiny and on the justification of the government's interest, which is no longer a part of the Bruin test. So I think this court has already established that the, has already addressed that there's not a strong, there's not a conclusive history and the state hasn't added here to establishing a historical tradition of a flat ban on possession in a park with felony penalties. So I think this is novel for under the Bruin test in violating the statute. So you have sensitive places, schools, polling places, legislative assemblies, those are sensitive places, right?  Yes, the Supreme Court. I don't know if they, I don't. Yeah, the Supreme Court has said. I'd like that they'd recognize legislative assemblies, I don't know, courthouses. Yeah, yeah. Okay, courthouses. Yes. Okay, so courthouses, thank you. But parks don't fit into that. School, presumably you have kids. The Supreme Court has identified, as you say, schools, government buildings, legislative assemblies, polling places, courthouses. Those are all buildings with government functions occurring inside. Arguably a school has an area around it, right? Most schools have an area around it. Perhaps. The playground. Playground, right? Yes. At a school, I think the Supreme Court has said there's a historical tradition of banning guns at schools. And they've never said it has to be an indoor space. They've never said that. They're essentially public forms. Correct. And I think if the state can show a historical tradition of banning guns in places like playgrounds that children assemble, then that would authorize a regulation that ban guns near children. That's not what the UUW statutes ban on all guns in all parks at all times does. Did I address your, in terms of sensitive places, could you repeat your question? I lost. I forgot. Okay. So you probably, you might have addressed it. You probably addressed it. I think that, you said public forms. Right. Again, the parks are used for many purposes. It is a Chicago public park more like Central Park in New York or more like Boston County? Well, this is all Illinois parks. Okay. All Illinois. And so I think that like some Chicago parks are, you know, urban parks comparable to Central Park. There are plenty of Illinois parks that are rural. Of course, you're bringing the facial challenge, so it would have to be unconstitutional in all its applications, correct? And again, even if the parks are similar to Central Park, that statute authorizes fines. This statute authorizes felony penalties. And as, which I think still shows evidence that it's unconstitutional where there's such a big difference. And even if, I think to go back to the time of the founding, there were public parks that were used for all the same purposes that Central Park, when it was founded, and then Chicago's municipal parks today were used. And the Second Amendment is not trapped in amber. Rahimi and Bruen have talked about this. It allows for the Second Amendment. It sure seems like it. Well, but it allows for the regulation of bearable arms that didn't exist at the time of the founding. And so it wouldn't trap it in amber if we said that the Second Amendment would somehow prohibit gun possession at the modern equivalence of spaces that existed at the founding when they existed then without any bans on possession. So, to, and additionally, I don't think the state here, in this case, or in the analysis in Wolfer and Taniak, has established any kind of difference between public parks at the founding and what they would consider modern parks. There may have been, you know, a greater investment in the space in cities and the money that went to public parks, but I don't think that makes for a categorical difference in the way the space was used from how they used it at the founding to what was happening in the late 19th century or today. They're still used for the same purposes, and the How do we know that? Well, in my reply brief, I did mention some of the ways that historical texts have talked about the uses of that. There's some cases, one of the cases cited, draws a distinction between Boston Common, which was used to graze animals and as military parade grounds originally, and that its recreational use was merely incidental, as opposed to a park like Central Park and the other sort of mid to late 19th century parks, which were specifically designed to be recreational. Your question is how to know the use? Well, I read it in the case. As you say, I am not a historian, I'm a lawyer, but this does go back to the fact that it's the state's burden, and where they haven't shown a historical tradition, then it's racially unconstitutional, and so until the Supreme Court lays out what exactly it requires to show a historical tradition, I still think the state bears that burden to show, and where they haven't, a flat ban on gun possession in a public space is not supported by what they've shown. Because you'd say, again, only going back 150 years doesn't bring us back to the enactment of the Second Amendment or the Fourteenth Amendment. Doesn't bring us back that far.  And since the Supreme Court has put such a premium on what existed at the time of the founding and their understanding... They haven't said it's exclusive, right? Certainly, but they have said that that is perhaps the most important time frame. And where public parks existed and were not new, then the fact that the state can't show something from the time of the founding that is similar in categorical bans in public spaces, they haven't met their burden. To go to the, again, to the felony penalties, nothing that the state has mentioned would authorize such severe penalties. And the, again, Rowan and Rahimi mentioned this as evidence of unconstitutionality. So, they say it's wrong. That the severity of the penalty is a relevant consideration. There's no case that says it's determinative or that it has to be the equivalent penalty. You're burdening or prohibiting gun possession. You know, you're prohibiting gun possession. And what the penalty is is maybe relevant to how strong a prohibition it is. So, it's still a prohibition. Rahimi says that even when a law regulates arms bearing for a permissible reason, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And so, in this instance, we have something that wasn't done at the founding at all. The most we can show is that starting in the late 19th century, gun prohibitions in parks authorized only fines. And so, the extent that Illinois' UUW statute criminalizes this is class 3 felony penalties for a first offense. Nothing in the historical tradition, whether at the time of the founding or much later, establishes anything close to that level of punishment. Even if we're going to talk about what were penalties at the time of the founding, probably weren't sentences of years of incarceration. They probably were more likely fines for some type of misdemeanor equivalent. Yes, I think the, however discussed is that many of the consequences at the time of the founding for violations of discharge or loading a gun were equivalent to minor public safety infractions like jaywalking. Again, nothing close to authorizing up to five years in prison. Are you familiar with National License Association versus Bondi with that case? Which discusses that and rejects your argument. But also says that, you know, penalties continue to evolve and become more serious over time. Not just for this, but for many kinds of conduct that were a fine, then became criminal, then became. And that, you know, the difference in penalties, again, not just positive. I would return to Bruins and Virginia's discussion of, you know, when the challenge regulation is much more severe than the analogs that are presented, that's evidence of unconstitutionality. If there aren't further questions, then I would return to the fact that it's the state's burden to demonstrate a historical tradition. They fail to do so here. And as a result, this court should find that the prohibition on guns in parks is basically unconstitutional. Thank you. May it please the court, counsel, I'm Tom Hansel, I'm the head of the people. As your honor mentioned, this is a facial challenge. So the question before this court is, is there any second of any day in any park in Illinois in which that park is sufficiently similar to traditional sensitive places? So with that, something we can all agree, or at least use our common experience to determine, is what is a park as we know them today? A park today, I would opine, is a public forum for community, family, and children. And with all due respect, are we going to look at European? How do we know what is a park, as Justice Mitchell asked? Is there evidence in the record as to what a park was at the time of the founding, what a park is now? No. So the record in this case deals with the challenge that was raised below, it was a motion vacated, which raised a claim, I believe he said, to Casaburias, which was an Aguilar project case. He argued that Casaburias found the statute in question facially unconstitutional, therefore his conviction is based upon a void ebony show statute. So there was no question about history or what is a park or what have you, it was just what was the holding of Casaburias. It's your burden to make this show. If the Second Amendment applies to the conduct that it should, and it does, then that shifts the burden to the state then to justify the regulation by reference to some historic analog. Yes. So Gruen sets forth that two-pronged or two-stepped approach to it. There's still the overarching burden on a facial challenge that's bared by the party bringing the challenge. But how do you meet that burden? How do you show a historic analog? Is it practical? So nothing was done here in this case.  I mean, there's obviously, as you all have acknowledged, there is the cites made in Wolford, Antonyuk, and those cases, as well as in our briefs and motions. There is discussion about whether experts would be necessary or how one can establish that. I think in this case, given our understanding of what is a park in today's day and age, what are sensitive places as well settled, sensitive places such as a school, which deals with a vulnerable population. It's not what a park is today, right? Isn't the question, what was a park at the time of the founding? I think that's one of the questions. I think that's a sub-question, I guess. The overarching question is, is a park today sufficiently similar to sensitive places that either there's a tradition of regulating or well settled sensitive places, which I guess the tradition is already settled and not at issue. So if there were or weren't parks in the founding era, would not solve this case, or would not resolve the issue before this court, because a park may be analogous to sensitive places in general, or other sensitive places. So what's the closest analog to a sensitive place from that era? A park today to a sensitive place from that era? I believe it's the public forum sensitive places of that era. So the line, as I view it, starts way back 1328, public forums talking about fairs and markets. So more than Antoinette, you'd follow that analysis.  Yeah, so then a public forum, and then all those municipal codes categorized parks as the new institution of parks that arose around the time of those. Or just parks in general, they categorized at the time, whether they're new or not. Categorized them as public forums. So brought them into that line. How does a court trial do justice to analogs? That's a fair question. I don't know that that can be fully known outside of the litigants. Doesn't it come down to whose burden it is, and did they make a shot? Well, yes. So it would, overarching question, was the facial challenge, was it proven? And sub-questions would be the steps. So if there is such a showing that there's a historical analog, the facial challenge would fail overall. Is the trial judge expected to know all these things? I don't believe so. I think that would be a lot to expect of them. I think in this case, there's fortunately several courts have gone through the historical analogs, and kind of set them out for us to use to analyze this. It's an odd way to make a factual finding. That is to say, you're going to rely on some reviewing court's representation of a record in another case. Believe it or not, there's often, or not often, there's occasionally a disparity between what a public court views a record as and what the record actually says. It's curious to me that that would be the way to make an accurate factual finding. Well, it's certainly, I believe this case is in a posture that is certainly a bizarre posture, which lends to why such a factual question would be not following the traditional path, I guess. With Bruin creating this test, and then courts trying to grapple with how you adapt to the test stated in Bruin, and then also a new challenge, or a new theory of the challenge being raised on appeal, it's created a very complicated situation to put forth the historical tradition. So it would have been better if we wouldn't have this, what you're characterizing as bizarre, if before the trial judge there would have been testimony about, let's describe this part, and it would have been the officer, or some witness testifying about what this part in question here is, Mr. Temple was arrested in, and maybe comparing it to parts from earlier eras. I think that would be the ideal situation. In part, I think it would certainly be ideal and necessary, if this were as applied, what was Palmer Park like on that day, or what is it like today? What was it like in those very moments that that occurred? So is the park as it was, and as this statute applied to Mr. Temple's conduct on that day, is it constitutional, or is it sufficiently similar with the historical analogs? I think if this were an as-applied challenge, that certainly would be the case, and I assume we certainly would have argued forfeiture and things like that. Given this is a facial challenge, I think we're unconcerned with what's Palmer Park like, or what was it like on, I believe this was in 2010 or 2001. We're more concerned with what is a park very generally, and then what sensitive places exist over time, how do they relate? I think even using those sensitive places as analogs, we could be comparing a school in today's day and age, which is a settled sensitive place, with a park today, and those in many ways compare, or they're sufficiently similar. They're both places that have large groups that congregate of vulnerable people, of children, and a park sets out for a number of reasons. There's a number of things you can do at parks, but I think in many people's minds, at least in mine, a park has children on a swing, a playground, a pool, a t-ball game, so on and so forth. It's tailored in many ways towards children, and it's built as a place, and carved out as a place in a city or a state or wherever it might be, for them to congregate, and for them to congregate safely. So when you're looking for whether something is or isn't a sensitive place, are you looking for a common thread with all the sensitive places, or just an analog to any of the listed sensitive places that the Supreme Court has identified? To any. So an analog to any. There's not, arguably a park has a lot of analogs to each of them, in part. But the public forum was the common thread. Well, certainly the park municipal ordinances stem into the public forum, the fairs, the markets, the balls, the circuses, all of that. That would be the public forum thread. But in addressing, I took it to be any sensitive place analysis, it could be any of those sensitive places, including a public forum. So a park may, as we've argued, is similar to a public forum. It's also in part similar to a polling place. Polling places exist in many parks. It might be similar in some ways to a legislative assembly. It might be, a courthouse might exist within a park and so on. Or other places like a, I don't know, a satellite office for a court might be adjacent or analogous to a courthouse if there were a challenge to that. Turning back to this case, a park is public forum, is the crux of our position. And it fits within that long line. Assuming Boston Common, even taking the proposition that Boston Common was a park, as we understand them today, their green space is set out. Boston Common, between now and the founding, as well as Reconstruction Era and the founding, there have been tremendous societal and technological changes that call for a nuanced approach and call for courts to grant weight and view evidence from later eras than the founding. Outside of just considering those within that long line of tradition, Boston, as an example, has grown tremendously in size. Populations have become more dense. I believe this was hashed out in Antonia, possibly, and also Wolfer, where populations became more dense. We moved from a very rural, spread out society to a more industrial, urban society. Firearms used to be muskets 90% of the time. You wouldn't keep them loaded. You wouldn't have pistols. Reconstruction Era, much more dense, much more urban. There's parks popping up as institutions. Firearms are much more accessible, including concealable, and firearms you could keep loaded. Boston Common is certainly relevant evidence. The crux of this case is not Boston Common. Even beyond the nuanced approach, Boston Common sets forth one thing. You could, with permission from the quartermaster, I believe it was, you could go and conduct militia training. That doesn't demonstrate that people carried firearms there, or that carriage of firearms there, if prohibited, would be inconsistent with the Second Amendment. It really just demonstrates that you could ask somebody, and they had a shooting range, essentially, and you could use it if you got permission. Knowing that people didn't keep firearms loaded there, so otherwise it would corrode, one could presume that people were not carrying loaded firearms, or if they were, without permission, to go conduct militia training. That would be unlawful. You wouldn't just be carrying with to go grazing, or go have a picnic and watch animals graze, or something like that. But also, there's a flaw in the logic, I believe, that Justice Barrett set forth in Rahimi or Bruin, and then it was further discussed in Antonia, that legislatures would legislate to the extent of their power, whereas legislatures legislate to issues that are before them, issues that are pressing, and they're not going to legislate to issues that are already, society may have already governed or regulated, various other rules outside of the law may regulate. They're not going to restate the obvious, essentially. I think Antonia set forth the idea of somebody setting forth the rules at a zoo isn't going to tell you you can't go into the lion exhibit. Common sense would state that. Social norms would state you don't do that. So now you're questioning, to some extent, the whole approach. You're saying looking to laws isn't really going to tell us what the parameters of the Second Amendment were at that time. Is that what you're saying? No. What are you saying? I'm saying that the absence of an express prohibition in what is arguably a park in the 1700s does not demonstrate that prohibition of firearms in parks is inconsistent with the Second Amendment. Okay. So now where do we look? Now we have nowhere to look. We can't look at the statutes. We have to really get an eyewitness who would happen to be around in the 1700s. That's going to be really hard. Even for you folks. I believe you can look to the statutes dating back to the 1300s which set forth this concept of a public forum as a sensitive place and then the unchallenged for over a century and a half municipal codes that set a park within. So the later history is really consistent with the earlier history because the earlier history there was no need to regulate. It's basically saying we are completely entitled to look at the laws in the 1800s because up to then there was no need necessarily to lay out laws. Is that what you're saying? Not unless there weren't parks. There weren't parks as we understand them. Certainly that's one of our positions. Our position isn't that the 1800s is the only evidence or that we should ignore prior evidence. The reality is in this case there is no evidence.  It's a facials court. We're just reaching and looking at cherry picking cases and determining history and tradition from that. Assuming this court wanted to reach the history, I believe we could from that or this court could. I believe this court could also look to settled sensitive places as they are today which protect vulnerable populations or they exist as they are a forum or a quintessentially crowded place full of vulnerable people such as children and that a park is essentially that. It's at least sufficiently similar on some day and time in some place in Illinois there is a park that is comparable in that moment to a school. Is it any part of that analog that it is the government that creates the park, regulates the park, supports the park, beautifies the park, takes care of the park just like it's the government that takes care of some schools, not all schools. Is the government's role in creating and maintaining this place any part of the sensitive place analysis in your view? There's discussion about the idea of the government protecting that space which I think is relevant in terms of what level of need might one have there in terms of a place that is not just set forth as a safe haven for let's say a group of vulnerable people. It's also a place that's understood that the government is regulating and protecting and maintaining. And before you sit down, can you address Mr. Temple's argument about the severity of the penalty currently versus historically? Absolutely. So I think the burden is more lenient in this instance in three ways than historically the burden imposed upon one is. The penalties, there are state statutes. I think we miss the forest for the tree if we're focused on what did the municipal ordinances which are issued by cities and are almost exclusively going to have civil penalties, what did they impose for a violation? I think the question more so is what was the penalty for possession of a firearm in a sensitive place historically? And dating back all the way to the founding, even 1328, prison time was a common penalty for that. Fines were a common penalty. Disarmament was a common penalty. This instance, one could still receive probation for it. So arguably the penalty where in the reconstruction era, if you're caught with a firearm in a sensitive place, you're going to prison. You're going to pay a fine and you might lose, at the very least you're losing the firearm you were caught with. There might be other repercussions. Here you could get probation. And obviously there are penalties that stem from having a felony conviction, but that's not any different than what existed then and thus you wouldn't have to go to prison as well. The prohibitions I would also state, you couldn't bring any gun, even though they were commonly unloaded then, anywhere, to any of these sensitive places I should say. So you leave home, you're going to a sensitive place, you're going to a park, you're going to a polling place, a government body, something like that. You have to leave your gun at home. Here instead, you could carry it in a certain way, unload it in case. Well, in that place. So you could go about your day fully armed. And then when you go to the park to watch a t-ball game or something like that, you have to unload it, put it in a case for the time you're in that sensitive place. And then afterwards, you can still, assuming you're not going to another sensitive place, you could still go about your day fully armed. So in terms of your full day or your daily life, the restrictions a lot less. And also a park is not somewhere you need to go. A polling place, in contrast, you don't have to go, but I would say it's very important for people to go to. Government bodies, courthouses, certainly there are instances where you have to go to court. So I would find that the penalties issue and the burdens are analogous, but also more lenient in this instance. So I don't believe that's an issue here. So for these reasons and the reasons stated in the brief, we ask this court to affirm the judgment of the lower court. Thank you. Just a couple of things to address in rebuttal. On the public assemblies historical tradition that the state is referencing, public assemblies are fundamentally different than public parks. The prohibitions against possession at public assemblies don't ban possession on any place where a public assembly might occur, whereas the state is suggesting this historical tradition would ban, would create an entire category of space that might be used as a public assembly at some point, and therefore possession is never authorized in that space. In terms of how people use parks, I think plenty of us walk through parks to get home, and where these sensitive places that the Supreme Court has identified have very limited need for, you know, to use your right to bear arms in public for self-defense, in those spaces where they're protecting government functions. That's not the same at an entire category of public space that's used, that is not regulated or as tightly controlled as these other sensitive places that the state references. So the state hasn't provided reasoning for why the self-defense concerns are so categorically different in a park from a public street that this would authorize a flat ban on possession in a public park. And where they're using the fact that sometimes the public assembles in parks, that historical tradition might authorize statutes banning gun possession at public assemblies, but not this whole category of space. The question Your Honor asked about, you know, the fact that governments control parks, that's also true for public streets. And I think Bruin addressed, you know, Bruin has a discussion of whether or not the whole of Manhattan is a sensitive place for being crowded, and the court found that it's not. So the state can't say a place that it would like to regulate or ban gun possession is a sensitive place in order to be able to do so. Where this ban on possession in this whole category does burden the right to possess a gun in public for self-defense. And since it is this flat categorical ban that imposes much harsher penalties than anything that the history the state references would authorize, this court should find that the state hasn't met its burden, that they haven't shown what they need to to demonstrate a historical tradition that would authorize such a categorical ban, and find the statute partially unconstitutional and vacate Mr. Temple's conviction. Thank you. Thank you. Thank you to all of you. This is really an excellent argument, excellent briefing, and we will take the matter under advisement.